Keith CROSS and Alfred Francis,
Plaintiffs–Appellees,

v.

NEW YORK CITY TRANSIT AU-
THORITY and Gregory Warren,
Defendants–Appellants.

Docket No. 04–2912–cv.

United States Court of Appeals,
Second Circuit.

Argued: March 22, 2005.

Decided: Aug. 2, 2005.

Steve S. Efron, New York, New York, for Defendants–Appellants.

Roosevelt Seymour, Brooklyn, New York, for Plaintiffs–Appellees.

Before: SOTOMAYOR, RAGGI, and HALL, Circuit Judges.

RAGGI, Circuit Judge.

Defendants-appellants New York City Transit Authority ("Transit Authority") and a Transit Authority Superintendent, Gregory Warren, appeal from a final judgment of the United States District Court for the Eastern District of New York (Charles P. Sifton, *Judge*), entered on April 22, 2004, awarding plaintiffs compensatory and liquidated damages for violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the New York Human Rights Law, N.Y. Exec. Law § 296 Defendants challenge (1) the verdict of liability as against the weight of the evidence; (2) the liquidated damages award because (a) plaintiffs failed to carry their burden on the element of willfulness, (b) the Transit Authority, as a governmental entity, is exempt from liquidated damages, and (c) Gregory Warren's liability was premised solely on the New York Human Rights Law, which does not provide for liquidated damages; and (3) the $50,000 compensatory award to each plaintiff for emotional distress because it "deviates materially" from amounts generally awarded in similar cases under New York law. N.Y. C.P.L.R. § 5501(c).

The record as a whole indicates that the jury awarded liquidated damages only against the Transit Authority and that the district court intended its judgment to reflect that award. To the extent the judgment is at all ambiguous in appearing to award damages against all defendants, the error is easily corrected. We hereby vacate the award of liquidated damages as against Warren. We affirm the district court's judgment in all other respects, finding no merit in defendants' remaining challenges.

## I. *Background*

At issue in this case are the circumstances in 1998–99 under which plaintiffs Keith Cross, then age 59, and Alfred Francis, then age 62—the two most senior Electronic Equipment Maintainer Helpers ("Helpers") at the New York City Transit Authority—received provisional promotions to positions as Electronic Equipment Maintainers ("Maintainers") only to be demoted within a few months back to Helpers.[1] Plaintiffs, both African–Americans, contended at trial that their demotions were based on race and age. Defendants countered with a nondiscriminatory reason: plaintiffs' inability to perform satisfactorily as Maintainers. The jury found that plaintiffs' demotions were discriminatory, but it found the cause to be the plaintiffs' age, not their race. Because defendants challenge the sufficiency of the jury finding of age discrimination, as well as the damages awarded, we are obliged to review the trial evidence in some detail, viewing all facts in the light most favorable to the plaintiffs and drawing all reasonable inferences in their favor. *See Fairbrother v. Morrison,* 412 F.3d 39, 48 (2d Cir.2005); *McCarthy v. New York City Technical Coll. of City Univ. of New York,* 202 F.3d 161, 165 (2d Cir.2000).

A. *The Plaintiffs' Promotions to Positions as Provisional Maintainers*

1. *The Defendants' Initial Resistance to Promoting Helpers to Fill Maintainer Vacancies or to Using Seniority as a Basis for Promotion*

In the summer of 1998, a Transit Authority reorganization resulted in a redistribution of work assignments, creating a need to hire a number of new Maintainers

---

**1.** A Maintainer installs and repairs the electronic equipment that makes up the Transit Authority's communication network. A Helper assists the Maintainer, generally by loading and transporting the necessary equipment to a work site.

at the East New York electronics shop. In September 1998, after the last qualified Maintainer candidate on the civil service eligibility list was hired, General Superintendent Gregory Warren notified the Transport Workers Union, Local 100 ("the union"), that he intended to look outside the Transit Authority to fill the remaining Maintainer vacancies. Union representatives objected, insisting that the Transit Authority afford Helpers the opportunity to advance their careers by promoting them to the open Maintainer positions. As a result of negotiations between Transit Authority management and the union, Warren agreed to send notices to all Helpers asking them to indicate in writing whether they were interested in provisional appointments as Maintainers. Nine Helpers, including plaintiffs, responded by expressing an interest in promotion: Alfred Francis, age 62; Keith Cross, 59; Marlon Boothe, 36; Mario Galvet, 39; John Polydore, 46; Abdull Rafeek, 38; Carvel Freirson, 43; Christopher St. John, 36; and Gary Credle, early 40s.

Warren advised the union that he would decide which of the interested Helpers best merited promotions to provisional Maintainers. Union representatives objected, insisting that seniority be the criterion for the promotions. At the time, Cross and Francis were not only the oldest but also the two most senior Helpers in the communications maintenance department. Once again compelled to accede to the union's demands, Warren promoted Cross and Francis in October 1998 to positions as provisional Maintainers in the East New York electronics shop.

### 2. *The Plaintiffs' Inferior Training*

Cross and Francis were apparently not trained together with other new Maintainer hires. Instead, plaintiffs continued to be assigned the same menial work that they had performed as Helpers. More important, Cross and Francis were not given technical manuals and training materials customarily distributed to new Maintainers, such as the Standard Operating Procedure and Base Station Maintenance Manuals and the operating manuals for test equipment used by Maintainers in the department. Plaintiffs had observed such materials being distributed to Maintainers Misa, Glazman, and Falsbaum, younger men recently appointed from the civil service list.

Eladio Diaz, a union official who had previously worked as a Maintainer under Warren, testified about the importance of training manuals in orienting a new Maintainer to his duties:

> When I was first hired I was given an SOP, which is a standard operating procedure, which is like a manual to us when we first start. It explains everything that is needed to accomplish any of the jobs including adjusting and locations of the equipment. It is broken up into sections that show you each specific equipment and how to adjust it. And other equipment and other manuals, such as manual for testing equipment and manuals on the base stations and other such equipment.

Trial Tr. at 321.

Defendants' witness, Foreman Vladimir Katkofsky, concurred in the importance of the Standard Operating Procedure Manual to new Maintainers:

> Usually, in our shop, every Maintainer would get SOP when he's hired. It is the standard.... [E]verybody is supposed to have it. It tells you how to address trouble calls, how to address field work. So Helpers wouldn't get them, but all Maintainers they would be given SOP's ... [B]ecause ... you see, the base stations at certain locations from time-to-time will have some addi-

tion. They will be in a small part, different shape from the other one. For example, maybe an antenna, a route change. Maybe one of the control boards for some reason changed. So all of the changes in the field equipment, the field base station and so on will be in this SOP's. So some guys have very good memory. They remember everything that went down five or six years ago at certain base stations, but not everybody has good memories. So it would make good policy to go to the SOP see if it was somehow changed from what we used to have.

*Id.* at 732. Katkofsky also testified that, with regard to the Base Station Maintenance Manual, "[i]n the beginning when you are not familiar with the base station ... it is very important." *Id.* at 733.

Francis made a number of specific requests to various supervisors for the training manuals but was told that none were available. On one occasion when Cross complained to Superintendent Donald George about not being provided with the training materials he had seen distributed to other Maintainers, George responded: "After all these years you guys been here, all of a sudden you want to be Maintainers." *Id.* at 244. On yet another occasion when Cross requested training materials, George replied: "Look Cross, I have my boss, I have to follow orders." *Id.*

Plaintiffs testified that when Foreman Katkofsky trained younger Maintainers Misa, Konstantin, and Glazman on the use of the R2670 analyzer, one of the primary pieces of electronic equipment used by Maintainers in the East New York shop, he provided them with colored illustrations and schematics to assist them in learning the operations of the equipment. Cross and Francis never received these materials. They were given only a few pages excerpted from the analyzer's four-hundred-page operating manual and perfunctory instructions about the machine's operation on the workplace floor. When, in December 1998, Cross and Francis were notified that they were to be tested on the R2670 analyzer, the men protested that they had not received adequate training to perform satisfactorily on the machine. Indeed, both men failed the analyzer test, prompting a recommendation that they be demoted to their former positions as Helpers.

The union protested the recommendation to Warren, pointing out that the testing equipment had never been made available to Cross and Francis for field use. Further, both men had been denied the use of notes and other procedures customarily used in radio equipment testing. The union complained that Cross and Francis were being discriminated against because of their race.

### B. The Plaintiffs' Demotion

In early 1999, Warren notified Cross and Francis that, to continue as Maintainers, they would have to submit to an *ad hoc* screening test of their basic competency and electronics knowledge. On advice from the union, plaintiffs refused to submit to the test because they knew that they had not received adequate training to demonstrate competency and they did not believe Warren was acting in good faith.

On March 28, 1999, supervisor Donald George informed Cross that he had failed successfully to complete his probationary period as a Maintainer and, accordingly, was being demoted to his former position as a Helper. On March 30, 1999, Francis received the same notice of demotion.

### C. The Training Program Following Plaintiffs' Demotions

Following plaintiffs' demotions, younger Helpers who had previously expressed an

interest in Maintainer promotions received provisional appointments. In contrast to Cross and Francis, these new Maintainers were placed in a structured training program along with fifteen provisional Maintainers recently hired from outside the Transit Authority. The group was assigned to a classroom at the Transit Authority's Jay Street headquarters where they received comprehensive instructions over a period of several months. Each trainee received a complete set of training manuals, operator's manuals, and testing equipment.

### D. The Verdict and Post–Verdict Motions

On March 3, 2004, after a six-day trial, the jury concluded that plaintiffs had failed to prove their claim of race discrimination but had established discrimination based on age. It awarded Cross compensatory damages of $42,000 for lost earnings and $50,000 for mental and emotional distress. The jury awarded Francis $2,500 for lost earnings and $50,000 for mental and emotional distress.[2] It further awarded both plaintiffs liquidated damages from the Transit Authority equal to their lost earnings.

Defendants subsequently moved pursuant to Fed.R.Civ.P. 50(b) for judgment notwithstanding the verdict, or, in the alternative, a new trial pursuant to Rule 59. In a Memorandum and Order filed April 22, 2004, the district court denied both motions, finding that the evidence of discriminatory intent was sufficient to support a jury verdict, that liquidated damages were properly available for de-

fendants' willful violation of the ADEA, and that the emotional distress awards were not unreasonable under New York law. Accordingly, it simultaneously entered a final judgment in favor of plaintiffs consistent with the jury verdict. Defendants timely appealed this judgment.

## II. Discussion

### A. The Sufficiency of the Evidence to Support Defendants' Liability for Age Discrimination

#### 1. Standard of Review

Defendants submit that the district court erred when it denied their post-verdict motion for judgment as a matter of law, see Fed.R.Civ.P. 50(b), and, instead, entered judgment in favor of plaintiffs on the claim of age discrimination in employment. To succeed on a Rule 50 motion, a movant must show that, after full hearing on an issue at trial, "there is no legally sufficient evidentiary basis for a reasonable jury" to resolve the issue in favor of the non-moving party. Fed.R.Civ.P. 50(a)(1). In reviewing a Rule 50 motion, a court may consider all the record evidence, but in doing so it "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); see also *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir.2002); *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir.1993); *Song v. Ives*

---

**2.** Shortly after his demotion, Francis left the communications maintenance department and accepted a position as a provisional Maintainer in the automatic fare collection department. He subsequently passed the civil service exam in the autumn of 1999 and was given a permanent appointment as a Revenue

Equipment Maintainer. Accordingly, his claim for lost wages encompasses only the difference in pay suffered in the short time between his demotion to Helper and his acceptance of the provisional Maintainer position in another department.

*Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992).

A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict. Under such circumstances, the district court may set aside the verdict only where there is " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.' " *Song v. Ives Labs., Inc.*, 957 F.2d at 1046 (quoting *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir.1980)) (first alteration in original); *see Taylor v. Brentwood Union Free Sch. Dist.*, 143 F.3d 679, 685 (2d Cir.1998); *Samuels v. Air Transp. Local 504*, 992 F.2d at 14. In other words, a Rule 50 motion must be denied unless " 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.' " *Samuels v. Air Transp. Local 504*, 992 F.2d at 14 (quoting *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970)); *Song v. Ives Labs., Inc.*, 957 F.2d at 1046.

Although we review the district court's denial of a Rule 50 motion *de novo*, we are bound by the same stern standards. *See Taylor v. Brentwood Union Free Sch. Dist.*, 143 F.3d at 685; *Samuels v. Air Transp. Local 504*, 992 F.2d at 14; *Song v. Ives Labs., Inc.*, 957 F.2d at 1046.

### 2. *The Evidence of Discrimination*

In reviewing a Rule 50 challenge to a verdict in favor of plaintiffs on a claim of age discrimination, the three-step *McDonnell Douglas* analysis applicable to motions for summary judgment provides useful guidance. *See Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir.2005) (and cases cited therein recognizing that framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for Title VII claims of race discrimination also applies to ADEA claims); *see also Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir.2000) (noting that "same standard that applies to a pretrial motion for summary judgment ... also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50" (internal quotation marks omitted)). Pursuant thereto, the initial burden rests with the plaintiff to establish a *prima facie* case of discrimination. "A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful discrimination" that then "shifts the burden of production to the defendant, who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action." *Woodman v. WWOR–TV, Inc.*, 411 F.3d at 76 (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir.2001)). If the defendant satisfies this burden, "the presumption of discrimination drops out" of the case, and the plaintiff must prove that a defendant's proffered reasons were not the true reasons for its actions but a pretext for discrimination. *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). In short, the plaintiff has the ultimate burden of "proving that his age was the real reason" for any adverse employment action. *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir.2000) (internal citations omitted); *accord Woodman v. WWOR–TV, Inc.*, 411 F.3d at 76.

Defendants concede, as they must, that plaintiffs adduced sufficient evidence at trial to satisfy their *prima facie* burden. They further acknowledge that plaintiffs

adduced sufficient proof to "permit a jury to reject defendants' claim that plaintiffs were provided training comparable, if not identical, to all other newly appointed Maintainers." Appellants' Br. at 14. Nevertheless, they submit that *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105, compels the conclusion that, as a matter of law, this evidence was insufficient to submit the case to the jury, let alone to support a jury finding that age·discrimination was the real reason for the adverse employment actions. We disagree.

In *Reeves v. Sanderson Plumbing Products, Inc.*, the Supreme Court considered "whether a defendant is entitled to judgment as a matter of law when the plaintiff's case consists exclusively of a prima facie case of discrimination and sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory explanation for its action." 530 U.S. at 137, 120 S.Ct. 2097. The Court concluded that the question admitted no single absolute answer but depended on the totality of the evidence in a particular case. In explaining why an affirmative answer was not always appropriate, the Court explained:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.... Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Id.* at 147–48, 120 S.Ct. 2097. In *Schnabel v. Abramson*, we recognized that "*Reeves* prevents courts from imposing a *per se* rule requiring *in all instances* that an ADEA claimant offer more than a prima

facie case and evidence of pretext." 232 F.3d at 90.

At the same time, however, *Reeves* cautioned that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." 530 U.S. at 148, 120 S.Ct. 2097. For example, "if the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," a defendant might well be entitled to judgment as a matter of law. *Id.*

■ In sum, *Reeves* instructs that "[w]hether judgment as a matter of law is appropriate in any particular case" depends on a careful review of the total evidence adduced, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148–49; *accord Schnabel v. Abramson*, 232 F.3d at 90 ("*Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 143, 120 S.Ct. 2097)).

■ Applying these principles to this case, we conclude that the trial evidence was sufficient to support the jury finding of intentional age discrimination. To satisfy their· *prima facie* burden, Cross and

Francis demonstrated that they were demoted as provisional Maintainers when younger workers were not. As a legitimate, nondiscriminatory reason for this disparate treatment, defendants asserted that plaintiffs failed to perform satisfactorily as Maintainers. To show that this was not the true reason for their demotions and that age discrimination was the real cause, Cross and Francis offered evidence (1) that defendants had initially taken steps to avoid promoting the plaintiffs, which defendants were compelled to abandon by union protests; (2) that after reluctantly promoting Cross and Francis, the defendants ensured the plaintiffs' eventual demotion by deliberately denying them the training necessary to perform satisfactorily as Maintainers, while at the same time providing that training to younger counterparts; (3) that defendants made various disparaging comments about older workers, including the plaintiffs; and (4) that after the plaintiffs' demotions, defendants placed their younger replacements in a structured training program for Maintainers. As this court has recognized, a showing of disparate treatment is "a common and especially effective method of establishing [an] inference of discriminatory intent." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir.2000). In this case, plaintiffs did not simply show disparate treatment in demotion; they showed that their demotions were the inevitable consequence of disparate treatment in training. Significantly, defendants did not acknowledge or offer a nondiscriminatory explanation for the training disparity. Instead, throughout trial, they insisted that there was no such disparity.

For example, defendant Warren testified that the plaintiffs had received the same training as younger provisional Maintainers. To the extent Cross and Francis offered direct evidence to the contrary, a reasonable jury could have concluded not only that there was a disparity in the training received by the plaintiffs compared to younger provisional Maintainers but that Warren deliberately testified falsely on this material fact. As the Supreme Court has observed, when a "factfinder's disbelief of the reasons put forward by the defendant ... is accompanied by a suspicion of mendacity," those circumstances, "together with the elements of the prima facie case," can support a finding of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 147, 120 S.Ct. 2097 (noting that, "[i]n appropriate circumstances, the trier of fact can infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose").

■ In this case, jury concerns about defendants' dissembling would have been fueled further by Warren's testimony that it was *his* decision to use seniority as the basis for deciding which Helpers would be promoted to Maintainer positions. Two union representatives, however, testified that Warren initially opposed appointing Maintainers from within the department, seeking to hire from the outside. Once compelled to promote from within, Warren sought discretion to ignore seniority as a promotion criteria, an option that would allow him to bypass plaintiffs. The law recognizes that "seniority is not a sufficiently accurate indicator of age" that, by itself, can support an inference that adverse actions based on seniority necessarily evidence age discrimination, *see Woodman v. WWOR–TV, Inc.*, 411 F.3d at 85; *Ludovicy v. Dunkirk Radiator Corp.*, 922 F.2d 109, 111 (2d Cir.1990); but that principle is not at issue here. The import of a jury finding that Warren testified falsely about his use of seniority—or any factor—

that would seemingly have favored plaintiffs' promotion is that such a falsehood could support a jury inference that the defendants, having been compelled to promote the older plaintiffs, made the deliberate decision to ensure that they failed in their new positions by providing them with inadequate training relative to younger counterparts. In short, this is not a case in which the plaintiffs "created only a weak issue of fact as to whether the employer's reason [for their demotion—lack of competency—] was untrue." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 148, 120 S.Ct. 2097. This is a case in which the defendants' discredited testimony at trial as to the means employed to achieve the discriminatory demotion—discriminatory training—itself strengthened plaintiffs' case.

In *Reeves*, the Supreme Court noted that a defendant might be entitled to judgment as a matter of law if "the record conclusively reveal[s] some other, nondiscriminatory reason for the [its employment] decision." *Id.* Defendants halfheartedly suggest that the record in this case reveals that the plaintiffs' supervising foreman was inclined to favor Maintainers who were Russian, the same nationality as himself. The argument is somewhat incongruous given the plaintiffs' assertion of a race discrimination claim, which was rejected by the jury. No matter. We note simply that the evidence shows that the younger Maintainers were not all Russian and that it was not only Russians who received more training than the plaintiffs. Thus, the jury could reasonably have rejected an argument that discrimination was based on national origin rather than age.

Finally, we note that this is not a case in which "abundant and uncontroverted independent evidence" was adduced showing that no age discrimination had occurred.

*Id.* To the contrary, plaintiffs offered proof of disparaging age-based comments by Transit Authority decision-makers from which the jury could reasonably conclude that defendants' resistance to promoting plaintiffs, their failure to provide plaintiffs with the same training as younger Maintainers, and their ultimate decision to demote plaintiffs were all based on hostility toward their age. For example, Francis testified that his supervisor George linked plaintiff's age to the unlikelihood of further advancement when he stated that Francis was "62 and over the hill and still a Helper ... hanging around and not going anywhere." Trial Tr. at 157. Cross testified to a similar disparaging remark when he asked George for the training manuals being provided younger provisional Maintainers. George scoffed, "After all these years you guys been here, all of a sudden you want to be a Maintainer." *Id.* at 244. Another comment by George indicated that the failure to provide plaintiffs with training manuals was not inadvertent: "Look Cross, I have my boss, I have to follow orders." *Id.* Francis also testified to a disparaging remark made by Warren regarding another 62–year–old employee. Warren said he "didn't know why [that employee] was still hanging around," that he "should be gone" because "[h]e had a number of years on the job," and "should be moving on." *Id.* at 182–83. Such age-hostile statements by the two primary decision-makers in plaintiffs' department, when considered together with all the other evidence in this case required the district court to submit this case to the jury and require us to affirm the denial of defendants' motion for a judgment in their favor notwithstanding the jury finding of age discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. at 151–52, 120 S.Ct. 2097 (specifically noting age-hostile remarks by decision-makers, as well as *prima facie* case and evidence chal-

lenging employer's explanation, in concluding that district court properly submitted case to the jury and that appellate court erred in reversing judgment based on its verdict in favor of plaintiff).

### B. *Liquidated Damages*

■ Defendants submit that, even if this court does not hold the liability verdict insufficient as a matter of law, the award of liquidated damages must be vacated because it is unsupported by evidence of the willfulness specifically required by the ADEA. The Transit Authority further argues that, as a government entity, it is exempt from a liquidated damages award. Meanwhile, Warren asserts that his liability was predicated solely on New York's Human Rights Law, which does not provide for liquidated damages. Only Warren's argument has merit.

#### 1. *The Evidence of Willfulness*

■ Under the ADEA, a plaintiff who establishes a "willful violation" of that statute can be awarded liquidated damages in an amount equal to unpaid wages. 29 U.S.C. § 626(b). As a general rule, the question of willfulness is properly left to the jury, and a reviewing court is "not permitted to substitute [its] judgment for that of the jury" even if it "might have resolved the issue differently had [it] been the finder of fact." *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1572 (2d Cir.1989).

Despite this deferential standard of review, the defendants assert that the liquidated damages award against them in this case must be vacated because the proof of willfulness was insufficient as a matter of law. They submit that plaintiffs failed to show that the charged age discrimination was committed by persons with actual knowledge of the ADEA or the existence of federal laws prohibiting discrimination based on age. The argument is unconvincing because actual knowledge is not the only means of proving willfulness.

■ Well-established precedent recognizes that the willfulness necessary to support liquidated damages under the ADEA can be established either by proof that a defendant actually knew that his conduct violated federal law *or* by reckless disregard of that fact. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 614, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (noting that ADEA violation is " 'willful' if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA" (quoting *Trans World Airlines v. Thurston,* 469 U.S. 111, 126, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)) (internal quotation marks omitted)); *accord Meacham v. Knolls Atomic Power Lab.,* 381 F.3d 56, 76–77 (2d Cir.2004) (citing *Hazen Paper v. Biggins,* 507 U.S. at 614, 113 S.Ct. 1701), *vacated on other grounds by KAPL, Inc. v. Meacham,* — U.S. ——, 125 S.Ct. 1731, 161 L.Ed.2d 596 (2005) (mem.) [3]; *Padilla v. Metro–North Commuter R.R.,* 92 F.3d 117, 123 (2d Cir. 1996). Thus, it is hardly surprising that the defendants can cite cases in which willfulness was established by proof of actual knowledge. Such evidence is "obviously enough" to satisfy a willfulness requirement. *McGinty v. New York,* 193 F.3d 64, 70 (2d Cir.1999). But where actual knowledge cannot be shown, evidence of

---

**3.** This court's discussion in *Meacham* of the law applicable to establishing the willfulness necessary to support a liquidated damages award under the ADEA is unaffected by the Supreme Court's recent decision to vacate the judgment in that case and to remand for this court's further consideration of the issue of disparate impact in light of *Smith v. City of Jackson,* — U.S. ——, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005). *See KAPL, Inc. v. Meacham,* — U.S. ——, 125 S.Ct. 1731, 161 L.Ed.2d 596.

a defendant's "reckless disregard" of the law prohibiting age discrimination can also serve as an alternative basis for finding willfulness. *Id.; see Meacham v. Knolls Atomic Power Lab.,* 381 F.3d at 76–77 (recognizing two standards for proving willfulness and upholding liquidated damages where "jury had sufficient proof of reckless disregard"); *Benjamin v. United Merchs. & Mfrs., Inc.,* 873 F.2d 41, 44 (2d Cir.1989) (upholding liquidated damages "when the proof shows that an employer was indifferent to the requirements of the governing statute and acted in a purposeful, deliberate, or calculated fashion").

In this case, the evidence was sufficient to support a jury finding that the defendants recklessly disregarded federal law prohibiting age discrimination. Viewed in the light most favorable to the plaintiffs, the evidence shows that Transit Authority supervisors who made age-hostile remarks to and about Cross and Francis deliberately afforded these men less training than younger provisional Maintainers in order to have an excuse to demote them. The creation of a calculated subterfuge to support an adverse employment action supports an inference that the employer knew or recklessly ignored the fact that their real reason for demoting the plaintiffs—age—was unlawful. *See, e.g., Kirsch v. Fleet St., Ltd.,* 148 F.3d 149, 164–65 (2d Cir.1998) (upholding jury verdict on willfulness under the ADEA because "[t]he jury permissibly found that [defendant] intentionally discharged [plaintiff] because of his age and that defendants sought to conceal their age-based motivation by proffering a pretextual rationale of corporate financial exigency"); *Benjamin v. United Merchs. & Mfrs., Inc.,* 873 F.2d at 44–45 (finding that jury could have inferred a willful violation of the ADEA where employer proffered false and shifting justifications for unlawful termination "calculated to conceal deliberate age dis-

crimination"; such evidence could support a finding that the employer "knew the law but at the same time attempted to evade it"); *Russo v. Trifari, Krussman & Fishel, Inc.,* 837 F.2d 40, 45 (2d Cir.1988) (internal memo discrediting sincerity of company's explanation for adverse action could support finding of willfulness because it "might be thought by the trier of fact to demonstrate not only deliberate age discrimination but also an appreciation of its illegality and a resultant attempt to conceal it"); *see also Kolstad v. American Dental Ass'n,* 527 U.S. 526, 551, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (Stevens, J., concurring in part, dissenting in part) ("There are other means of proving that an employer willfully violated the law. An employer, may, for example . . . conceal evidence regarding its 'true' selection procedures because it knows they violate federal law.").

Further supporting this inference is evidence that the union specifically complained to defendants that their treatment of Cross and Francis was impermissibly discriminatory. Although these complaints apparently focused on plaintiffs' race rather than age, the fact that defendants ignored the warning and proceeded to demote plaintiffs, to replace them with younger Helpers, and to place these younger hires in a structured training program strengthens the inference that the defendants were "indifferent" to whether federal law proscribed age discrimination; their "calculated" purpose was to develop a corps of young Maintainers. *See Benjamin v. United Merchs. & Mfrs., Inc.,* 873 F.2d at 44.

In sum, because the record is sufficient to support a jury finding that the defendants willfully discriminated against the plaintiffs based on age, this prong of their challenge to the liquidated damages award must be rejected as without merit.

2. *The Transit Authority's Exemption from Liquidated Damages*

■ The Transit Authority contends that, as a matter of law, it is not subject to liquidated damages under the ADEA because such damages are punitive rather than compensatory, and government entities are exempt from punitive damages. The plaintiffs assert that ADEA liquidated damages are distinguishable from punitive damages. In any event, they submit that Congress expressly intended liquidated damages to be recoverable from any employer who willfully engaged in age discrimination, even public entities.

■ The question of whether public employers are exempt from the liquidated damages provision of the ADEA is a matter of first impression in this circuit. Although this court has upheld liquidated damages awards against municipal entities on at least two occasions, the question of a public-entity exemption from punitive damages appears not to have been litigated in either case. *See Stratton v. Dep't for the Aging,* 132 F.3d 869, 881 (2d Cir.1997); *Padilla v. Metro–North Commuter R.R.,* 92 F.3d at 123–24. Not surprisingly, district courts have been uncertain about what weight, if any, to give these decisions and have reached conflicting conclusions on the issue of government immunity from liquidated damages. *Compare Epter v. New York City Transit Auth.,* 216 F.Supp.2d 131, 136–37 (E.D.N.Y.2002) (upholding liquidated damages against the government in light of the Second Circuit's "unwillingness to strike down the liquidated damages awards" in *Stratton* and *Padilla* ), *and Fink v. City of New York,* 129 F.Supp.2d 511, 523 (E.D.N.Y.2001) (imposing an award of liquidated damages against the City of New York under Uniform Services Employment and Reemployment Rights Act, which is "very similar to 29 U.S.C. § 626(b), a provision allowing liquidated damages for willful violations under the ADEA"), *with Vernon v. Port Auth. of N.Y. & N.J.,* No. 95 Civ. 4594(PKL), 2003 WL 1563219, at *12 (S.D.N.Y. Mar. 26, 2003) (holding that, "since liquidated damages in this [ADEA] context would be deemed punitive damages and Port Authority is immune from punitive damages, liquidated damages would not be available under the ADEA"). We here clarify that state and local government employers are subject to liquidated damages under the ADEA.

■ At the outset, we acknowledge the Supreme Court's recent instruction that "[s]ince municipalities' common law resistance to punitive damages still obtains, 'the general rule today is that no punitive damages are allowed unless expressly authorized by statute.'" *Cook County v. United States ex rel. Chandler,* 538 U.S. 119, 129, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (quoting *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 260 n. 2, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)). Thus, in considering the Transit Authority's challenge to the liquidated damages award in this case, we must first determine whether ADEA liquidated damages are properly viewed as punitive and, if so, whether the statute explicitly authorizes their award against public employers.

On the first issue, plaintiffs argue that ADEA liquidated damages are unlike punitive damages because they are statutorily capped at an amount equal to back pay. *See* 29 U.S.C. § 626(b) (incorporating provision of Fair Labor Standards Act ("FLSA") providing for liquidated damages in an amount equal to the employee's "unpaid minimum wages, or their unpaid overtime compensation," 29 U.S.C. § 216(b)). Thus, the traditional concern with allowing punitive damages against government entities—the danger of subjecting the government to crippling and

open-ended damage awards for the actions of its agents—is not at issue under the ADEA. *Cf. Cook County v. United States ex rel. Chandler,* 538 U.S. at 132, 123 S.Ct. 1239 (noting, in False Claims Act case, that the jury's "open-ended discretion over the amount [of a punitive damage award]" is a reason to disallow such awards against municipal defendants). Whatever the logical appeal of plaintiffs' argument, we are bound by the Supreme Court's ruling that "Congress intended for [the ADEA's] liquidated damages to be punitive in nature." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. at 125, 105 S.Ct. 613; *see also Commissioner v. Schleier,* 515 U.S. 323, 331–32, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995) (relying on *Thurston* to hold ADEA liquidated damages punitive for purposes of calculating recipient's tax obligations). Indeed, this court has similarly concluded that ADEA "liquidated damages may fairly be characterized as 'punitive in nature' [because] they do after all provide an ADEA victim with more than his or her out-of-pocket damages or any other strictly compensatory amounts." *McGinty v. New York,* 193 F.3d 64, 70–71 (2d Cir.1999) (citing *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.,* 818 F.2d 278, 282 (2d Cir.1987)) (internal citations omitted).

This conclusion, however, does not end the inquiry. Notwithstanding the punitive nature of the ADEA's liquidated damages provision, we must consider whether the statute expressly authorizes their recovery against a government employer. We note that a number of our sister circuits, like this court in the past, have upheld liquidated damages awards against government employers without specifically construing the intent of the statute. *See, e.g., Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1253 (5th Cir.1995) (upholding award of liquidated damages against a school district under the ADEA when the issue on appeal was whether the school

district had willfully violated the ADEA); *Lee v. Rapid City Area Sch. Dist. No. 51–4,* 981 F.2d 316, 319–20 (8th Cir.1992) (*en banc*) (remanding for assessment of full liquidated damages against the school district under the ADEA when the issue on appeal was whether the district court erred in reducing such damages); *Orzel v. City of Wauwatosa Fire Dep't,* 697 F.2d 743, 758–59 (7th Cir.1983) (upholding liquidated damages award against municipal fire department under the ADEA when issue on appeal focused on willfulness). More recently, however, the Third Circuit in *Potence v. Hazleton Area School District,* 357 F.3d 366, 372–73 (3d Cir.2004), examined the language and structure of the ADEA in some detail and concluded that it does authorize liquidated damages awards against government employers. We find its analysis convincing and adopt it as our own.

*Potence* notes that "[t]he ADEA makes it unlawful for an employer 'to fail or refuse to hire or to discharge' an individual because of his or her age." *Id.* at 373 (quoting 29 U.S.C. § 623(a)(1)). Because state and municipal entities are expressly included within the ADEA definition of an "employer," *see* 29 U.S.C. § 630(b), the statute "could not be more explicit in imposing liability for age discrimination against municipalities" and agencies thereof. *Potence v. Hazleton Area Sch. Dist.,* 357 F.3d at 373.

*Potence* further notes that the ADEA specifically incorporates many of the enforcement powers, remedies, and procedures of the FLSA, *see* 29 U.S.C. § 626(b), notably 29 U.S.C. § 216(b), which states that "[a]ny employer who violates [the FLSA] shall be liable to the employee or employees affected in the amount of their unpaid wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated

damages." 357 F.3d at 372. That same section further specifies that an action to recover such damages "may be maintained against any employer (including a public agency)." *Id.* § 216(b); *see also id.* § 203(x) (defining "public agency" to include a "State or political subdivisions thereof"). Thus, as *Potence* concludes and we agree, the language of this integrated statutory scheme, read as a whole, "makes it clear that Congress intended to subject municipalities ... to the liquidated damages provision of the ADEA." *Potence v. Hazleton Area Sch. Dist.,* 357 F.3d at 373.

In urging us not to follow *Potence,* defendants contend that the Third Circuit failed to consider the fundamental difference between liquidated damages under the FLSA, which the Supreme Court has identified as compensatory, *see Overnight Motor Transp. Co. v. Missel,* 316 U.S. 572, 583–84, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942) (recognizing FLSA damages as "compensation, not a penalty or punishment," because such damages might compensate for "damages too obscure and difficult of proof for estimate"); *accord Reich v. Southern New England Telecomm. Corp.,* 121 F.3d 58, 71 (2d Cir.1997), and liquidated damages under the ADEA, which, as already noted, have been recognized as punitive, *see generally Commissioner v. Schleier,* 515 U.S. at 331–32, 115 S.Ct. 2159 (rejecting argument that incorporation of FLSA's liquidated damages provision evidenced Congress's intent for ADEA liquidated damages to be viewed as compensatory; recognition of such damages as punitive in *Trans World Airlines, Inc. v. Thurston,* 469 U.S. at 125, 105 S.Ct. 613, controlled). Defendants point us to the Supreme Court's specific acknowledgment that Congress's incorporation of the FLSA remedies in the ADEA was selective, not wholesale: "in enacting the ADEA, Congress exhibited ... a willingness to depart from those provisions regarded as undesirable or inappropriate for incorporation." *Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). Moreover, they note that one such departure is Congress's limitation on ADEA liquidated damages to cases involving willful violations of law. *See id.* ("[W]hile incorporating into the ADEA the FLSA provisions authorizing awards of liquidated damages, Congress altered the circumstances under which such awards would be available in ADEA actions by mandating that such damages be awarded only where the violation of the ADEA is willful."); *see also Commissioner v. Schleier,* 515 U.S. at 331, 115 S.Ct. 2159 (observing that "the liquidated damage provisions of the ADEA ... were a significant departure from those in the FLSA").

This limitation, however, hardly supports the Transit Authority's argument that it is exempt from a liquidated damages award for willful age discrimination. While Congress may have selectively incorporated the FLSA's liquidated damages provision into the ADEA, the very fact that it narrowed its reach to cases involving willful age discrimination only highlights the absence of any limits on the provision's application to all employers, explicitly including public entities. Defendants can point to no language in the ADEA itself evidencing Congress's intent to limit liquidated damages to private employers. The plain language of § 626(b), the ADEA enforcement provision that references liquidated damages, applies equally to all employers. Further, the ADEA, like the FLSA, includes state and local government entities within its definition of employer.

In other contexts, Congress has expressed its intent to distinguish public from private employers in creating remedies for employment discrimination. Notably, government entities are exempted from the punitive damages provision of

Title VII. *See* 42 U.S.C. § 1981a(b)(1). No such exemption, however, appears in the ADEA. Defendants argue that any ambiguity created by the lack of a specific ADEA exemption should operate in their favor because express statutory authorization is required to assess punitive damages against a government entity. *See Cook County v. United States ex rel. Chandler,* 538 U.S. at 129, 123 S.Ct. 1239. What defendants ignore is that it is not the absence of an explicit exemption that supports imposing ADEA liquidated damages against government employers. Rather, it is the specific inclusion of government actors in the ADEA definition of employer, together with the ADEA's unmodified incorporation of the FLSA provision expressly providing for liquidated damages to be recovered from public entities, that compels us to reject their exemption argument. As the Third Circuit observed in *Potence,* this specific statutory language, read as a whole, provides stronger evidence of congressional intent to impose punitive damages on government entities than the circumstances supporting that conclusion in *Cook County:*

> In *Cook County,* the Supreme Court held that under the False Claims Act ("FCA") treble damages could be imposed against municipalities because ever since the statute's creation in 1863 its definition of "person" was intended to cover local governments, and Congress did not manifest an intent to limit the scope of that definition when it raised the ceiling on the damages in 1986. In contrast to the FCA, which does not explicitly identify a municipality as a "person," the ADEA, in the provisions quoted above, does explicitly include state and local governments in the definition of "employer." Thus, we need not move beyond the plain language of the statute or go to lengths to consider the historical context of the statute as the

Court did in *Cook County.* Rather, the language of the ADEA itself makes it clear that Congress intended to subject municipalities like the School District to the liquidated damages provision of the ADEA.

> Inasmuch as the statute expressly authorizes the imposition of liquidated damages against a municipality, even though such damages are punitive in nature, we conclude that the District Court did not err in assessing liquidated damages against the School District.

*Potence v. Hazleton Area Sch. Dist.,* 357 F.3d at 373 (internal citation omitted).

■ Because we agree with this reasoning, we similarly conclude that the ADEA authorizes the imposition of liquidated damages against government employers who engage in willful age discrimination. Accordingly, we affirm the liquidated damages award against the Transit Authority.

### 3. *Liquidated Damages Against Warren*

■ Warren argues that liquidated damages cannot be awarded against him because his liability was predicated solely on New York's Human Rights Law, which does not provide for liquidated damages. Plaintiffs do not appear to dispute this argument.

A review of the record plainly reveals that the jury was properly instructed to consider liquidated damages only as against the Transit Authority and that it only awarded these damages against that defendant. To the extent the judgment in this case indicates that all damages are recoverable from all defendants, the error appears to have been inadvertent. Because the error is purely legal, it is easily corrected on appeal. *See Baker v. Dorfman,* 239 F.3d 415, 420–21 (2d Cir.2000)

(holding that error in a final judgment may be corrected on appeal where the issue is purely legal, requires no fact finding, and is easily resolved). We hereby vacate the judgment insofar as it awards liquidated damages against Warren.

### C. Compensatory Damages for Emotional Distress

■■■■ Defendants fault the district court for denying them remittitur of the $50,000 compensatory damage award to each plaintiff for emotional distress. Remittitur is "the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328 (2d Cir.1990) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984)) (internal quotation marks omitted); *see also Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 914–15 (2d Cir.1997) (noting that a court may not "reduce the damages without offering the prevailing party the option of a new trial" (internal citations omitted)). We review a district court's ruling on a remittitur motion "only for abuse of discretion." *Rangolan v. County of Nassau,* 370 F.3d 239, 245 (2d Cir.2004); *see also Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 435–38, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).

■■ The emotional distress damages at issue were awarded pursuant to plaintiffs' pendant state law claims. *See Haskell v. Kaman Corp.,* 743 F.2d 113, 120–21 (2d Cir.1984) (noting that "plaintiffs are not entitled to recovery for emotional distress in ADEA actions"). Thus, the district court was obliged to review the award

under New York law. *See Consorti v. Armstrong World Indus., Inc.,* 103 F.3d 2, 4 (2d Cir.1995) (per curiam) (observing that "we are obligated to use the standard that New York law prescribes"); *see also Gasperini v. Center for Humanities, Inc.,* 518 U.S. at 419, 116 S.Ct. 2211 (holding that New York law with respect to remittitur of excessive compensation awards could be given effect by federal courts consistent with Seventh Amendment). New York C.P.L.R. § 5501(c) provides that an award of damages must be reduced if it "deviates materially from what would be reasonable compensation." This standard "calls for closer surveillance than 'shock the conscience' oversight." *Gasperini v. Center for Humanities, Inc.,* 518 U.S. at 424, 116 S.Ct. 2211.

Defendants contend that, where emotional distress claims are unaccompanied by any evidence of medical treatment or other concrete proof of duration, extent, and consequences, an award of $50,000 deviates materially from reasonable compensation. As this court recently observed, however, "New York cases vary widely in the amount of damages awarded for mental anguish." *Meacham v. Knolls Atomic Power Lab.,* 381 F.3d at 78.[4] Thus, we reiterate that while many cases applying N.Y. C.P.L.R. § 5501(c) "reduce awards to $30,000 or below," *id.* (collecting cases), others "uphold awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment," *id.* (collecting cases). Thus, *Meacham* rejected defendant's challenge to a remittitur order of $125,000 for mental anguish to plaintiffs "who had not offered evidence of treat-

---

4. This observation, like *Meacham's* discussion of willfulness, is unaffected by the Supreme Court's decision to vacate the judgment in the case and remand to this court for reconsideration in light of the discussion of disparate impact in *Smith v. City of Jackson,* 125 S.Ct. at 1541–1545. *See KAPL, Inc. v. Meacham,* —— U.S. ——, 125 S.Ct. 1731, 161 L.Ed.2d 596.

ment or physical sequelae." *Id.* at 68. *Meacham* observed that, "[w]hen confronted with the range of mental anguish verdicts approved under New York law," this court could not find a $125,000 award "to deviate substantially from verdicts awarded under similar circumstances." *Id.* at 78.

The same conclusion applies to the challenged awards in this case, which fall well below the $125,000 awards upheld in *Meacham.* Although neither Cross nor Francis sought medical treatment for mental anguish, each plaintiff testified to specific humiliation, anger, and frustration experienced as a result of defendants' age discrimination. Cross described the humiliation he felt while being ridiculed by his foreman and others who never took his promotion seriously and while being assigned the same menial tasks as a Maintainer that he had performed as a Helper. Cross also testified about the shame of his demotion and his fears of discussing it with his wife. He testified that he lost interest in family activities, went to the doctor more often to check his blood pressure, and sought spiritual counseling from a fellow church member. Francis testified that his frustration at work caused him to become "angry" and "lash[ ] out at people who were not responsible for [his] predicament." Trial Tr. at 156. He further testified about being "depressed, snapping at [his] wife and children [and always being] in a state of just anxiety" because he felt that authority was being exercised against him in an arbitrary way and he was powerless to remedy the situation. *Id.*

In light of this evidence, we conclude that the district court did not abuse its discretion in concluding that the mental anguish damages awarded by the jury in this case did not deviate materially from reasonable awards in comparable cases arising under New York law.

### III. *Conclusion*

To summarize, we conclude that the evidence in this case was sufficient to support the jury verdict that the defendants willfully discriminated against the plaintiffs based on age. We further conclude that the plaintiffs have a right to recover liquidated damages for this willful discrimination from the Transit Authority because the ADEA authorizes such damages against public as well as private employers. The plaintiffs cannot, however, recover liquidated damages against individual defendant Gregory Warren because his liability is predicated on New York's Human Rights Law, which does not provide for liquidated damages. Finally, we conclude that the district court did not abuse its discretion in declining to grant a remittitur of the jury's $50,000 compensatory award to each plaintiff for mental anguish.

We VACATE that part of the district court's April 22, 2004 judgment awarding liquidated damages against defendant Warren. In all other respects, the judgment of the district court is AFFIRMED.